UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ALEXANDER CHIEW, *on behalf of himself
and all others similarly situated*,

                        Plaintiff,

          - against -

TD BANK, N.A.,

                     Defendant.
--------------------------------------------------------x

                        **MEMORANDUM & ORDER**
                         24-CV-7566 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Alexander Chiew[1] brings this action against Defendant TD Bank, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, as well as violations of New York General Business Law § 349 ("Section 349"); the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq.*; and the Delaware Consumer Fraud Act, Del. C. §§ 2511-27 *et seq.*[2] (FAC, Dkt. 19, at 14–20.)  Before the Court is Defendant's motion to dismiss Plaintiff's Complaint in its entirety.  (Mot. to Dismiss, Dkt. 23.)  For the reasons stated herein, Defendant's motion is granted in part and denied in part.

---

[1] Plaintiff also brings this action on behalf of a purported class.  (First Am. Compl. ("FAC"), Dkt. 19, ¶ 1.)

[2] Plaintiff alleges, and Defendant does not contest, that the Court has jurisdiction over this action pursuant to the Class Action Fairness Act because at least one of the putative class members and Defendant are diverse and the aggregate claims of the class exceed $5 million.  (*Id.* ¶ 10.) The Court agrees.

**BACKGROUND**

**I.     Factual Background[3]**

When a consumer makes a purchase with a credit card, they are generally not charged an upfront fee by their credit card issuer.  (FAC, Dkt. 19, ¶ 14.)  Rather, the issuer provides a "grace period" by which a cardholder may pay off a purchase in full and thus avoid fees or interest on the outstanding balance.  (*Id.*)  One exception to this practice occurs when the credit card is used for a cash advance.  (*Id.* ¶ 15.)  A cash advance is "commonly and reasonably understood" as "a small, short-term loan available through banks, credit cards, lending apps and other sources."  (*Id.* ¶ 16.)  When a credit card is used for a cash advance, the issuer will immediately assess interest and upfront fees.  (*Id.* ¶ 15.)  Cash advance fees aim to "discourage the use of credit cards for cash loans."  (*Id.*)

Defendant is a national bank that provides retail banking services to consumers, including by issuing credit cards.  (*Id.* ¶¶ 2, 13.)  Defendant, like other major credit card issuers, charges a "transaction fee" on cash advances.  (*Id.* ¶ 19.)  The fee is $10 or 5% of the advance, "whichever amount is greater."  (*Id.* ¶ 20.)  Defendant's Credit Card Agreement ("Agreement") details that the following transactions are considered cash advances and therefore subject to a fee:

> Cash Advances obtained from a financial institution, an automated teller machine, or any other party that agrees to honor your Card or Account for cash advance purposes, and all convenience checks posted to your account are considered Cash Advances. For example, your Card may be used to obtain cash advances at ATMs displaying the VISA logo and from participating financial institutions honoring VISA credit cards. Transactions to obtain the following goods and services will also be treated as a Cash Advance: travelers checks, foreign currency, money orders, wire transfers, cryptocurrency, debt repayments, lottery tickets, casino

---

[3] The Court assumes the truth of the FAC's non-conclusory factual allegations.  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

gaming chips, race track wagers, legal online wagers, or similar betting transactions, and any other similar cash-like transactions.

(*Id.* ¶ 21; *see also* Agreement, Dkt. 19-1.)

Plaintiff alleges that Defendant charges cash advance fees on transactions that fall outside of those enumerated in the Agreement. (FAC, Dkt. 19, ¶ 28.) Plaintiff focuses on one kind of transaction: making payments on peer-to-peer mobile applications. (*See id.* ¶¶ 23, 43.) Peer-to-peer mobile applications, such as Venmo, PayPal, and Wise,[4] allow users to pay peers as well as businesses for goods and services. (*Id.* ¶ 42.) Plaintiff contends that Defendant's Agreement provides "[r]easonable consumers . . . [with] no reason to conclude" that they would be charged cash advance fees when making such payments. (*See id.* ¶ 72.) Payments on Wise are not like wire transfers, Plaintiff contends, because wire transfers "rely on the SWIFT (Society for Worldwide Interbank Financial Telecommunication) network" to "route[] money through a series of intermediary banks," whereas Wise does not use the SWIFT network. (*Id.* ¶ 44.) Nor is making a payment on Wise akin to a transaction to obtain a money order, Plaintiff maintains. (*Id.* ¶ 45.) Payments on peer-to-peer applications like Wise "are digital and only can be sent to a specific recipient, as opposed to a money order," which is a "physical and negotiable instrument." (*Id.*) For similar reasons, Plaintiff asserts that making a payment on Wise is unlike transactions to obtain "foreign currency," or "travelers[] checks," which "can be independently possessed to make a later purchase or transfer," (*see id.* ¶ 29), or "withdrawing paper currency from an ATM or bank," which gives "the cardholder legal tender that can be spent anywhere," (*see id.* ¶ 46). Peer-to-peer applications like Wise give consumers "no option to receive cash." (*Id.*)

---

[4] Wise is a peer-to-peer mobile application that allows users to make person-to-person money transfers using their credit cards. (*See* FAC, Dkt. 19, ¶¶ 40, 42, 48.)

Plaintiff alleges that the Agreement's reference to "other similar cash-like transactions" does not encapsulate payments made on peer-to-peer applications. (*Id.* ¶ 43; Agreement, Dkt. 19-1, at ECF[5] 4.) "Cash-like," Plaintiff asserts, "reasonably mean[s] currency or currency equivalents that can be used for any purpose," and thus covers transactions to obtain travelers checks, money, orders, or foreign currency. (FAC, Dkt. 19, ¶ 29.) By contrast, peer-to-peer applications "facilitate transactions for goods and services," and do not offer "cash-like loans." (*Id.* ¶ 47.) Making a payment on a peer-to-peer application is more equivalent to "standard digital purchases or swiping a credit card with a merchant that uses Stripe or Apple Pay." (*Id.*)

According to Plaintiff, for many years, Defendant did "*not* treat payments made on peer-to-peer mobile applications as 'cash advances' and did *not* charge Cash Advance Fees on such transactions." (*Id.* ¶ 33.) Defendant hid its "true list of transaction types it considers [to be] 'cash-like transactions.'" (*Id.* ¶ 26.) Defendant changed its policy on charging fees on peer-to-peer applications "[o]nly recently, and unbeknownst to consumers." (*Id.* ¶ 33.) It now "routinely" assesses fees on transactions that are "not 'similar' to cash and that totally lack cash's essential characteristic as a fungible method of payment." (*Id.* ¶ 28.) For example, on March 10, 2024, Plaintiff used his TD Bank card on Wise to purchase jewelry for $1,182.14. (*Id.* ¶ 48.) In so doing, Plaintiff "never received any cash or a cash-like transaction from [Defendant] that could later be used for a purchase." (*Id.* ¶ 30.) Nonetheless, Defendant "deemed Plaintiff's jewelry purchase . . . a 'cash advance' and charged [him] a cash advance fee of $59.11, in addition to immediately-accruing interest." (*Id.* ¶ 48.)

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

## II.     Procedural History

On October 29, 2024, Plaintiff filed his Complaint against Defendant, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, as well as violations of New York's and New Jersey's consumer protection laws.  (Compl., Dkt. 1.)  Plaintiff brought these claims on behalf of a putative class of "similarly situated TD Bank credit card holders who were improperly charged Cash Advance Fees on transactions that were not 'cash-like transactions.'"  (*Id.* ¶ 8.)  After Defendant filed a motion to dismiss, (Dkt. 18), Plaintiff amended his Complaint, adding an allegation that Defendant violated the Delaware Consumer Fraud Act, (FAC, Dkt. 19).  Defendant has moved to dismiss the FAC on all counts.  (Dkt. 23.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face where it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  In reviewing a complaint for failure to state a claim, the Court accepts as true all factual allegations and draws from them all reasonable inferences, while disregarding "conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

## DISCUSSION

## I.     Breach of Contract

Defendant argues that Plaintiff's breach of contract claim must be dismissed because the Agreement unambiguously allowed it to treat Plaintiff's Wise transaction as a cash advance.

5

(Def.'s Mem. in Supp. of Mot. to Dismiss Pl.'s Am. Compl. ("MTD"), Dkt. 24, at 8.)  For the following reasons, the Court disagrees and finds the Agreement ambiguous as to whether Defendant charges cash advance fees for payments made on peer-to-peer mobile applications.

### A.    Delaware Contract Law

As a threshold matter, the Agreement contains a "Governing Law" provision directing that Delaware law "shall govern this agreement," (Agreement, Dkt. 19-1, at ECF 2).  The parties also agree that Delaware law governs their contractual dispute, (MTD, Dkt. 24, at 8 n.12; Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Opp'n"), Dkt. 26, at 4 n.2).  Accordingly, the Court applies Delaware contract law.  To state a claim for a breach of contract under Delaware law, a plaintiff must allege "(1) the existence of a contract; (2) breach of that contract; and (3) damages resulting from the breach." *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 674 F. Supp. 2d 562, 567 (D. Del. 2009).

"When a motion to dismiss hinges on the interpretation of a contract, a trial court may only grant the motion if the defendants' interpretation of the contract is 'the *only* reasonable construction as a matter of law.'" *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1143 (Del. 2025) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)). Delaware law instructs that a contract must be constructed with the goal of "giv[ing] effect to the intent of the parties." *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (citing *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).  As to intent, "Delaware adheres to the 'objective' theory of contracts," in which a "contract's construction should be that which would be understood by an objective, reasonable third party." *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).  The contract must also be read as a whole, giving effect to the plain meaning of "clear and unambiguous language." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836,

6

846 (Del. 2019) (quoting *Osborn*, 991 A.2d at 1159–60); *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (citing same).  Language is ambiguous where it is "susceptible to more than one reasonable interpretation." *Terrell*, 338 A.3d at 1276–77 (quoting *Manti*, 261 A.3d at 1208).

"In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions." *VLIW Tech.*, 840 A.2d at 614–15; *see Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).  Thus, "[i]f the Plaintiff has offered a reasonable construction of the contract, and that construction supports the claims asserted in the complaint, then the Court must deny the motion to dismiss even if the defendant's construction is also reasonable." *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, No. CV 12648-VCS, 2017 WL 1732369, at *7 (Del. Ch. May 3, 2017) (citing *Vanderbilt Income*, 691 A.2d at 613).

## B.    Plaintiff Has Plausibly Alleged a Breach of Contract

Plaintiff alleges that his transaction on Wise was not a "cash-like transaction" because it did not share "the 'cash-like' characteristics of other items on the list," including money orders and wire transfers.  (*See* Opp'n, Dkt. 26, at 5 (explaining that "such transactions must be 'similar' to the other items in the preceding list" and that "[n]one of the items on the list" are akin to peer-to-peer applications).)  Plaintiff contends that the "listed" transactions in the Agreement "share the characteristic of *fungibility*" because they "involve using a credit card to purchase money."  (*Id.*; *see* FAC, Dkt. 19, ¶¶ 28, 42–46.)  As further support, Plaintiff points to the first portion of the "Cash Advances" section in the Agreement, which provides that "transactions to *obtain* the following goods and services"—travelers checks, wire transfers, money orders—will be treated as Cash Advances.  (Agreement, Dkt. 19-1, at ECF 4 (emphasis added).)  This prefatory language, Plaintiff asserts, establishes that the "relevant inquiry" to whether a transaction is "cash-like" "is

7

what the consumer obtains at the conclusion of the transaction." (Opp'n, Dkt. 26, at 5–6 (emphasis omitted).)  Thus, when read alongside the exemplar transactions, "cash-like" "must refer only to the use of the TD credit card to purchase fungible, currency-like items," such as "a traveler[s] check, foreign currency, [or] a money order." (*Id.* at 5.)  Plaintiff's use of Wise to pay for jewelry was not a "cash-like transaction," Plaintiff asserts, because he "didn't obtain a money order or gaming chips or anything else he could possess and later use like cash." (*Id.* at 6.)[6]

The Court finds Plaintiff's interpretation is reasonable.  To define the meaning of "similar cash-like transactions," Plaintiff invokes *ejusdem generis*, a rule of construction that provides that "where general language follows an enumeration of . . . things, . . . such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 580 n.86 (Del. 2019) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004)).  Plaintiff interprets the common characteristic of the transactions enumerated by the Agreement as "cash-like" as those in which an individual obtains fungible currency.  This interpretation is bolstered by the facts Plaintiff alleges about money orders, wire transfers, and travelers checks in his Complaint, (*see* FAC, Dkt. 19, ¶¶ 42–47), which the Court must accept as true for purposes of a motion to dismiss, *Kiobel*, 621 F.3d at 124.  Beyond these allegations, however, another portion of the "Cash Advances" section of the Agreement supports Plaintiff's contention that "cash-like" refers to transactions where one obtains fungible

---

[6] Plaintiff also points to the language of other cardholder agreements as proof of the ambiguity in Defendant's Agreement. (FAC, Dkt. 19, ¶¶ 35–40 (claiming that Chase's agreement defines cash-like transactions as including "***person-to-person money transfers*** and account-funding transactions that transfer currency"); Opp'n, Dkt. 26, at 7–8.)  Under Delaware law, however, a court will consider extrinsic evidence only where a contract is ambiguous, not, as Plaintiff urges, to establish ambiguity. *See Sunline*, 206 A.3d at 847.

currency: the "Cash Advances" section in the Agreement also describes "cash advances" as those "obtained from . . . an automated teller machine," (Agreement, Dkt. 19-1, at ECF 4), namely, "paper currency" or "legal tender that can be spent anywhere," (FAC, Dkt. 19, ¶ 46). The Agreement further distinguishes "cash-like" transactions from "Purchases" made with a TD Credit Card, which occur when the card is used to "purchase or lease goods and services." (Agreement, Dkt. 19-1, at ECF 4.) In other words, a four-corner reading of the Agreement supports Plaintiff's interpretation that "cash like transactions" refers to transactions in which one obtains physical currency or a fungible instrument. (*See* FAC, Dkt. 19, ¶ 47 (alleging that peer-to-peer applications "facilitate transactions for goods and services, not cash-like loans").)[7]

Indeed, at least one other court in this Circuit has found an interpretation similar to Plaintiff's to be reasonable. In *Tucker v. Chase Bank USA, N.A.*, the parties disputed whether acquisitions of cryptocurrency were "cash-like transactions" and therefore subject to cash advance fees under Chase Bank's credit card agreement. 399 F.Supp.3d 105 (S.D.N.Y. 2019). Chase's agreement, like the Agreement at issue here, provided: "[t]he following transactions will be treated as cash advances: *purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions*." *Id.* at 109. The *Tucker* plaintiffs asserted that "'cash-like transactions' should be read to be limited by the words which proceed it: travelers checks, foreign currency, money orders, and wire transfers. . . . Thus, 'similar cash-like transactions' may reasonably be limited to other instruments with face monetary values that create legal claims to fiat currency." *Id.* at 113–14. The district court found this interpretation was supported by other

---

[7] The Agreement also refers to travelers checks, foreign currency, money orders, and the like as "goods and services." (Agreement, Dkt. 19-1, at ECF 4.) However, the Agreement, by prefacing this list as "*the following* goods and services," makes clear that these items belong to a narrower, distinct category than the goods and services discussed in the "Purchases" section. (*Id.* (emphasis added).)

provisions in the contact, which described obtaining "cash from automatic teller machines." *See id.* at 113. Because the district court found that the plaintiffs had "identified a reasonable interpretation of 'cash-like transactions' that would exclude [the purchase at issue]," it denied the motion to dismiss. *Id.* at 114.

Defendant seeks to distinguish this case from *Tucker* by plucking facts from outside of the Complaint. Defendant cites to websites and press releases as proof that Wise transactions are "materially identical to the money orders and wire transfers specified in the TD Bank Agreement." (MTD, Dkt. 24, at 5–6, 10, 14 ("Indeed, Wise explicitly categorizes such transactions as money orders or wire transfers.").) In so arguing, Defendant asks the Court to take judicial notice of these sources. (*Id.* at 5–6, 10.) Although the Court could do so, it would serve Defendant no benefit here. The Court can take judicial notice of the *existence* of the websites to which Defendant points, but it may not assume the *truth* of the facts therein, which it would be required to do to credit Defendant's argument. *See Moore v. Madison Reed, Inc.*, No. 1:22-CV-0115 (GLS) (DJS), 2023 WL 5097966, at *11 n.3 (N.D.N.Y. Aug. 9, 2023) (taking judicial notice of a website but maintaining that "the truth of the material . . . is not subject to judicial notice at this stage of the proceeding"); *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 136 n.1 (E.D.N.Y. 2019) (reaching a similar conclusion). Thus, the Defendant has not convinced the Court that *Tucker* is inapposite.

Defendant next asserts that Plaintiff's interpretation "strains the contract language" because the "Agreement neither uses the word 'fungible' nor implies Plaintiff's proposed fungibility requirement." (MTD, Dkt. 24, at 12, 14.) Rather, Defendant contends, "cash-like transactions" are those that "convey[] cash through a third-party intermediary, rather than directly through the credit-card network, to a specific person or entity." (*Id.* at 10.) Defendant similarly

10

relies on *ejusdem generis* to reach this conclusion, asserting that "the most direct analogues to Plaintiff's money transfer—money orders and wire transfers—are used to direct funds to a specific recipient" rather than through the credit card network. (*Id.* at 10, 12.)  Defendant insists that Plaintiff "concede[d]" that Wise operates "in the same manner" as wire transfers and money orders, because Plaintiff admitted that Wise operates "as intermediaries for one party to pay another party" and that he "obtain[ed] the right to proceed with a [Wise] transaction." (Def.'s Reply in Supp. of Mot. to Dismiss ("Reply"), Dkt. 25, at 3 (first quoting FAC, Dkt. 19, ¶ 47, then quoting Opp'n, Dkt. 26, at 6).)  Defendant's interpretation of "cash-like transactions" hinges on how it defines money orders, wire transfers, and travelers checks.  However, whether Plaintiff has, in effect, conceded that Wise *operates* "in the same manner" as these forms of currency transactions has no effect on whether the Agreement supports *Plaintiff's* interpretation, that peer-to-peer applications do not qualify as cash advances under the Agreement.  Defendant's motion to dismiss only succeeds if its interpretation is "the *only* reasonable construction as a matter of law." *Vanderbilt Income*, 840 A.2d at 613 (citation omitted).

The Court concludes that Defendant has not met this high burden here.  In arguing for dismissal, Defendant urges the Court to credit its application of *ejusdem generis* over Plaintiff's.  But Defendant does not provide any persuasive basis for doing so, beyond broad declarations that the Agreement is unambiguous.  Rather, Defendant derives the common characteristics of the enumerated "cash-like transactions" from caselaw discussing how money orders, wire transfers and travelers checks operate.  (*See* MTD, Dkt. 24, at 4–5 (citing *Delaware v. Pennsylvania*, 598 U.S. 115, 124, 129 (2023) (money orders); *Jakob v. JPMorgan Chase Bank, N.A.*, 639 F. Supp. 3d 406, 410, 413 (E.D.N.Y. 2022) (wire transfers); *Xanthopolous v. Thomas Cook, Inc.*, 629 F. Supp. 164, 170 (S.D.N.Y. 1985) (travelers checks); *Citicorp v. Interbank Card Ass'n*, 478 F. Supp. 756,

759 (S.D.N.Y. 1979) (same)); *id.* at 10 (reiterating these cases).)  Defendant does not, for example, attempt to discredit the common characteristic Plaintiff identifies, such as by arguing that it is belied by the plain language or by other provisions of the Agreement.  *See, e.g.*, *Fried v. AdaptHealth, LLC*, No. 24-CV-0305 (GBW), 2025 WL 1135203, at *3 (D. Del. Apr. 17, 2025) (responding to a defendant's argument that the plaintiff's interpretation ignored the plain language of a contract and was inconsistent with other provisions).  And though Defendant is correct to state that the Agreement makes no mention of Plaintiff's fungibility requirement, the same criticism can be leveled against Defendant's interpretation, as the Agreement makes no mention of using third party intermediaries, either.  (*See generally* Agreement, Dkt. 19-1.)[8]  Thus, while the Court concludes that Defendant offers a reasonable interpretation of the Agreement, *see Tucker*, 399 F. Supp.3d at 113, it finds that Defendant has failed to establish that its interpretation is the *only* reasonable one.

As exemplified here, *ejusdem generis* "often gives rise to the question [of] how broadly or narrowly to define the class delineated by the specific items listed."  *Capriglione v. State ex rel. Jennings*, 279 A.3d 803, 807 n.32 (Del. 2021); *White v. Crowley*, No. CIV.A. 84C-AP-87, 1986 WL 5850, at *2 (Del. Super. Ct. May 8, 1986) (describing the "difficulty" with *ejusdem generis* "lies in defining the common characteristic of the things specifically stated"); *see also, e.g.*, *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 347–49 (S.D.N.Y. 2007) (grappling with competing interpretations that both used *ejusdem generis*).  Because Plaintiff and Defendant

_____

[8] Although there may be other arguments available to Defendant, the Court "declines to make [Defendant's] arguments for it or fill in the blanks on [Defendant's] behalf where briefing is inadequate." *Ryan v. Cmty. Based Servs., Inc.*, No. 24-CV-2801 (KMK), 2025 WL 2709126, at *4 n.1 (S.D.N.Y. Sep. 23, 2025) (internal quotation marks omitted) (quoting *United States ex rel. Taylor v. GMI USA Corp.*, 774 F. Supp. 3d 645, 672 (S.D.N.Y. 2025)); *see Rubenstein v. Cosmos Holdings, Inc.*, No. 19-CV-6976 (KPF), 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020) (declining "to make arguments for dismissal that defendants chose not to present").

have both offered reasonable interpretations of "cash-like transactions," the Court concludes that the phrase is ambiguous.  Accordingly, Plaintiff has plausibly alleged a breach of contract.  *See Tucker*, 399 F. Supp. 3d at 113–14 (rejecting motion to dismiss where plaintiff and defendant offered different reasonable interpretations relying on *ejusdem generis*).

## II.    Implied Covenant of Good Faith and Fair Dealing

Defendant next asserts that Plaintiff's implied covenant claim fails because Plaintiff has not plausibly "alleged a specific implied contractual obligation." (MTD, Dkt. 24, at 15–16.)  The Court agrees.  "[T]o state a claim for breach of the implied covenant, a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages." *Dunn v. FastMed Urgent Care, P.C.*, No. CV 2018-0934 MTZ, 2019 WL 4131010, at *4 (Del. Ch. Aug. 30, 2019) (quoting *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. CV 9522-CB, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015)); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).  Plaintiff fails to do so with the requisite specificity.  Although the FAC lists examples of implied covenants, such as "willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance," Plaintiff does not specify *which* obligation Defendant breached, instead conclusorily declaring "[Defendant breached] the implied covenant of good faith and fair dealing" when it "began charging Cash Advance Fees" on payments made on peer-to-peer applications without notice. (FAC, Dkt. 19, ¶¶ 71, 73.)  As numerous courts have held, these sparse allegations do not state an implied covenant claim under Delaware law.  *See, e.g.*, *Reklam v. Bellator Sport Worldwide LLC*, No. 16-CV-285 (JFB) (SRF), 2017 WL 5172397, at *5–6 (D. Del. Nov. 8, 2017) (dismissing an implied covenant claim because a plaintiff failed to identify a specific implied obligation and instead only made conclusory allegations regarding bad faith), *report and recommendation adopted,* No. 16-CV-0285, 2017 WL 5585562 (D. Del. Dec. 1, 2017); *Berg v.*

*C&H Fin. Servs., Inc.*, No. 23-CV-0181 (CFC), 2024 WL 1255504, at *5–6 (D. Del. Mar. 25, 2024) (dismissing a complaint for failing to identify a specific implied contractual obligation).

To the extent Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by "exercis[ing] its discretion in bad faith to maximize its Cash Advance Fee revenue," (FAC, Dkt. 19, ¶ 72; Opp'n, Dkt. 26, at 12 (arguing that "[Defendant] exercised its contractual discretion in bad faith in a way that 'piles on ever greater penalties' on cardholders")), this argument fails because no such discretion can be reasonably inferred from the Agreement. Delaware law recognizes implied covenants to, *inter alia*, fill in contractual gaps, such as "imply[ing] certain corresponding conditions" to "express terms" in the contract. *See Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116–17 (Del. 2022). Accordingly, where a contract expressly vests a party with discretion, and the scope of discretion is not specified, Delaware law recognizes an implied covenant to exercise such discretion in good faith. *See id.* at 1116 (maintaining that "if one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination" (alterations in original) (quoting *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, No. 15202, 1996 WL 560190, at *2 (Del. Ch. Sep. 25, 1996))); *Star Am. Rail HoldCo, LLC v. Cathcart*, No. 2024-0883 LWW, 2024 WL 5239938, at *9 (Del. Ch. Dec. 17, 2024) ("[W]hen a contract provides discretion to one party and the scope of that discretion is not specified 'the implied covenant requires that the discretion be used reasonably and in good faith." (alteration in original) (citation omitted)); *In re Chase Bank USA, N.A. "Check Loan" Cont. Litig.*, No. 09-CV-2032 (MMC), 2009 WL 4063349, at *7 (N.D. Cal. Nov. 20, 2009) (concluding that a party's "right to modify the term" of the agreement was subject to the implied covenant of good faith and fair dealing under Delaware law (citing *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005))). Here, Plaintiff

suggests Defendant exercised its discretion in "elect[ing] to treat Plaintiff's purchase of jewelry as a 'cash advance,' and charg[ing] Plaintiff a cash advance fee plus immediately accruing interest." (FAC, Dkt. 19, ¶ 4.)

However, the plain text of the Agreement belies the existence of any contractually vested discretion, and thus, a valid implied covenant claim. Unlike other bank agreements that allow a Bank to *choose* which transactions will be subject to fees, the Agreement here provides that "cash-like transactions" "*will* . . . be treated as a Cash Advance." *Compare* (Agreement, Dkt. 19-1, at ECF 4 (emphasis added)), *with Hoard v. Cap. One, N.A.*, No. 24-CV-1133 (MMA) (VET), 2024 WL 4611449, at *1 (S.D. Cal. Oct. 29, 2024) (contract defined a cash advance as "a loan in cash or *things we consider cash equivalents*, including wire transfers, travelers[] checks, money orders, foreign currency, lottery tickets, gaming chips, and wagers" (emphasis added)), *and Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 949 (N.D. Cal. 2009) (contract stated that bank "may" return an item to avoid overdraft fees). Because the Agreement squarely "addresses the conduct at issue," Plaintiff's reliance on the implied covenant doctrine is inappropriate. *See Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015)); *Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.").

Absent any contractually vested discretion, Plaintiff's implied covenant claim merely rehashes its breach of contract claim. *See Shakesby v. SNC Int'l*, No. N22C-11-070 MAA CCLD, 2023 WL 8187301, at *6 (Del. Super. Ct. Nov. 27, 2023) (determining implied covenant claim "merely attempts to recast" breach of contract claim where contract expressly addressed conduct at issue); *Paperless Sols. Grp., Inc. v. MIB Grp., Inc.*, No. N24C-11-277 MAA CCLD, 2025 WL

1466603, at *4 (Del. Super. Ct. May 21, 2025) (maintaining implied covenant claim "mimick[ed]" breach of contract claim where plaintiff "[did] not identify a gap to fill or term to be implied"); *accord Richard v. Glens Falls Nat'l Bank*, No. 20-CV-0734 (BKS) (DJS), 2021 WL 810218, at *15 (N.D.N.Y. Mar. 3, 2021) (dismissing implied covenant claim as duplicative of a breach of contract claim because allegation that a defendant "executed its contractual obligations in bad faith" was "simply another way of alleging that [d]efendant exploited an ambiguity" in an agreement); *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 641 (S.D.N.Y. 2020) (dismissing an implied covenant claim because plaintiffs' argument that defendant "breached the implied covenant by using its discretion to interpret the ambiguous contract terms in bad faith" merely "repackag[es] . . . [a] breach-of-contract theory"); *Roy v. ESL Fed. Credit Union*, No. 19-CV-6122 (FPG), 2020 WL 5849297, at *10 (W.D.N.Y. Sep. 30, 2020) (rejecting implied covenant claim as duplicative of breach of contract claim where plaintiff alleged that the defendant bank "exercises its discretion to interpret the terms of the Account Agreement and charge fees in bad faith"). Accordingly, Plaintiff's implied covenant claim is dismissed.

### III.    Consumer Protection Statutes

Defendant next asserts that Plaintiff's New York, New Jersey, and Delaware consumer protection claims must be dismissed because (1) Plaintiff fails to allege that any deception caused his injuries; and (2) Plaintiff's claims under these statutes are duplicative of his breach of contract claims.   (MTD, Dkt. 24, at 16–22; Reply, Dkt. 25, at 7–9.)   Although Defendant addresses Plaintiff's consumer protection claims collectively, the Court declines to follow its approach, because the requirements of each state's statute differ.   For the reasons stated below, the Court finds that Plaintiff plausibly alleges a claim under New York's consumer protection statute, but grants Defendant's motion to dismiss as to Plaintiff's claims brought under New Jersey's and Delaware's consumer protection statutes.

16

### A.    New York General Business Law § 349

Section 349 makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York state.  N.Y. Gen. Bus. Law § 349(a).  To state a claim under Section 349, a plaintiff must plausibly allege: (1) "the challenged act or practice was consumer-oriented"; (2) the act "was misleading in a material way"; and (3) "the plaintiff suffered injury as a result of the deceptive act."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017); *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).  The Court finds that Plaintiff has plausibly alleged all three elements.

First, to establish that a practice is consumer-oriented, a plaintiff must show that "the conduct at issue 'potentially affect[s] similarly situated consumers.'"  *Wilson*, 625 F.3d at 64 (alteration in original) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 623 N.Y.S.2d 529, 533 (1995)).  "[T]he deceptive act or practice may not be limited to just the parties."  *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 145 (1995); *see Oswego*, 623 N.Y.S.2d at 533 (explaining the acts at issue "were not unique to these two parties").  Although a plaintiff need not "prove a repetition or pattern of deceptive behavior," a plaintiff must show "potential impact on consumers at large."  *Teller*, 213 A.D.2d at 145; *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 490 (E.D.N.Y. 2020).  Here, Plaintiff contends that the Agreement is a "materially uniform" "form contract," that all "TD Bank credit card holders are subject to."  (FAC, Dkt. 19, ¶¶ 18–19.)  This boilerplate language suggests that Defendant's deceptive acts have the potential to be "repeated in order to deceive numerous similarly situated buyers."  *See Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449–50 (S.D.N.Y. 2004); *Makuch v. N.Y. Cent. Mut. Fire Ins. Co.*, 785 N.Y.S.2d 236, 238

(4th Dep't 2004) ("[T]he allegations that the forms making up plaintiffs' insurance policy are standard and regularly used by defendant are sufficient to support the allegation that defendant's actions are consumer-oriented."). Plaintiff has therefore adequately alleged that Defendant's conduct has "a broader impact on consumers at large" and is consumer-oriented. *Lussoro*, 456 F. Supp. 3d at 490 (reaching the same conclusion where "Plaintiff's claim stems from the representations made by Defendant in its standard Contract"); *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 575 (E.D.N.Y. 2015) (concluding that a plaintiff "plausibly alleged consumer-oriented conduct" where conduct was "based on an Account Agreement the [d]efendant uses with all of its deposit account customers" (citing *Makuch*, 785 N.Y.S.2d at 238)); *Kelly v. Cmty. Bank, N.A.*, No. 19-CV-0919 (MAD) (CFH), 2020 WL 777463, at *9 (N.D.N.Y. Feb. 18, 2020) (finding a complaint plausibly alleged consumer-oriented conduct where it "allege[d] that Defendant's violations of Section 349 stem from the representations made in the standard Account Agreement").

As to the second element of a Section 349 claim—whether the act was misleading in a material way—a plaintiff must allege a "representation[] or omission[]" that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 85 N.Y.2d at 26; *Stutman*, 95 N.Y.2d at 29; *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344 (1999). Here, Plaintiff alleges that the Agreement "used misleading contract language to deceive consumers about the true nature of its Cash Advance fees practices"—namely, that it would levy fees on the use of peer-to-peer payment applications. (*See* FAC, Dkt. 19, ¶¶ 8, 87.) "[B]ased on the text of the [Agreement]," Plaintiff argues, "[n]o reasonable consumer would expect to be charged Cash Advance Fees on day-to-day purchases using third party apps." (*Id.* ¶¶ 96, 98.) Plaintiff further alleges that Defendant failed to notify Plaintiff that it began to treat payments

18

made on peer-to-peer applications as cash advances. (*Id.* ¶ 33.)  As several courts in this Circuit have found, allegations of contract language that is easily misunderstood by consumers plead a materially misleading representation under Section 349.  *See, e.g.*, *Lussoro*, 456 F. Supp. 3d at 491 (concluding plaintiff plausibly alleged this element where they asserted that "the Contract and Opt-In Form materially mislead a reasonable consumer into thinking that Defendant will only assess[] overdraft fees when transactions overdraw a customer's account, when that is not the case in practice"); *Kelly*, 2020 WL 777463, at *9 (determining plaintiff plausibly alleged that representations in a contract defining overdraft fees were materially misleading because a "reasonable consumer" could believe, based on this definition, that overdraft fees would not be charged on a certain kind of transaction).[9]  The same is true for allegations that a business failed to disclose material information—that the business alone possessed—concerning its interpretation of a contract term.  *See Oswego*, 85 N.Y.2d at 26 (explaining that omissions could fall within Section 349 where "the business alone possesses material information that is relevant to the consumer and fails to provide this information"); *see also Bildstein v. MasterCard Int'l, Inc.*, No. 03-CV-9826I (WHP), 2005 WL 1324972, at *4 (S.D.N.Y. June 6, 2005) (concluding that plaintiff plausibly alleged deception by omission where complaint alleged that MasterCard "went to great efforts to conceal the [foreign currency transaction fee] by embedding it in the currency conversation rate and failing to disclose its existence" (internal quotation marks omitted)); *Chiste*

---

[9] Thus, contrary to what Defendants assert, the Agreement may be misleading even though it disclosed that it would charge fees on "any other similar cash-like transactions."  (MTD, Dkt. 24, at 19 n.20.)  As Plaintiffs allege, a reasonable consumer might still reasonably believe, based on this language, that payments made on peer-to-peer applications would not be charged cash-advance fees.  (Compl., Dkt. 19, ¶¶ 27, 28, 40, 72 (alleging that "[r]easonable consumers would have no reason to conclude, based on the TD Bank Credit Card Agreement's ambiguous definition of cash advance equivalents, that they would be charged Cash Advance Fees for [payments made on peer-to-peer applications]").)

*v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 405–06 (S.D.N.Y. 2010) (reasoning that plaintiff pled a materially deceptive practice where she alleged that defendant did not disclose that it *always* collected a tax on the Retail Rate, and that this fact was not ascertainable from defendant's user agreement, which stated that actual tax cost "*may* vary from the tax recovery charge").  Plaintiff has therefore plausibly alleged materially misleading representations and omissions in how Defendants crafted and interpreted the Agreement.[10]

As to the third element of a Section 349 claim—injury caused by the deceptive act— Defendant avers that "Plaintiff has not alleged that he even read the contract or was otherwise exposed to the contract provision he alleges [Defendant] breached."  (MTD, Dkt. 24, at 19.) Defendant confuses reliance with causation.  "Reliance is the causal link between an alleged deceptive practice and a consumer's decision to transact business with the defendant, whereas causation refers to the link between an alleged deceptive practice and an actual injury sustained by a consumer as a result of . . . such a practice."  *Morrissey v. Nextel Partners, Inc.*, 880 N.Y.S.2d 874, at \*5 (N.Y. Sup. Ct. Albany Cnty. 2009), *aff'd as modified*, 895 N.Y.S.2d 580 (3rd Dep't 2010).  As New York courts have established, reliance is not an element of a Section 349 claim. *Stutman*, 95 N.Y.2d at 29; *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55 (1999).  Thus, contrary to what Defendant asserts, Plaintiff need not allege that he read or relied on the

---

[10] The Complaint's allegations of deceptive contract language thus distinguish it from complaints courts have dismissed because they failed to allege "an act or practice that was misleading in a material respect separate and apart from" a breach of contract. *Compare Chambers v. HSBC Bank USA*, N.A., No. 19-CV-10436 (ER), 2020 WL 7261155, at \*5 (S.D.N.Y. Dec. 10, 2020), *and Perks*, 444 F. Supp. 3d at 642 (dismissing Section 349 claim because "Plaintiffs have not alleged an act or practice that was misleading in a material respect separate and apart from the Amended Complaint's allegations that TD Bank breached the Agreement"), *with McNeil v. Cap. One Bank, N.A.*, No. 19-CV-0473 (FB) (RER), 2020 WL 5802363, at \*2 (E.D.N.Y. Sep. 29, 2020) (finding Section 349 claim stated based, in part, on allegation that Bank engaged in deceptive business practices by defining a term in a misleading way, and that this claim was distinct from breach of contract claim).

misrepresentation.  *See Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 42 (N.D.N.Y. 2022) (determining that, because Section 349 does not impose a reliance requirement, "Plaintiff need not allege that he ever read the Account Agreements to satisfy causation"); *McNeil*, 2020 WL 5802363, at *3 (rejecting contention that a plaintiff needed to allege that he read the Agreement because New York law does not require a showing of reliance); *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 183–84 (2021) (Fahey, J., dissenting in part) (rejecting argument that a complaint must be dismissed because plaintiffs did not plead that they "saw the allegedly deceptive statements upon which they rely" in part because the defendant "concedes that reliance is not an element of a General Business Law § 349 claim").[11]

---

[11] The Court acknowledges that courts in this Circuit, including one unpublished opinion by the Second Circuit, have held to the contrary.  *See, e.g.*, *Grossman v. GEICO Cas. Co.*, No. 21-CV-2789, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022) (summary order) (dismissing Section 349 claim where complaint did not allege that plaintiffs viewed deceptive advertisement (citing *Gale v. Int'l Bus. Machs. Corp.*, 9 A.D.3d 446, 447 (2d Dep't 2004)); *Lin v. Can. Goose US, Inc.*, 640 F. Supp. 3d 349, 360 (S.D.N.Y. 2022) (dismissing a Section 349 claim because the plaintiff did not allege he "saw the misrepresentations prior to his purchase"); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 472 (S.D.N.Y. 2022) ("[A] plaintiff must plausibly allege he or she was exposed to the deceptive conduct in the first instance." (citing *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 740 (W.D.N.Y. 2020))).  The Court, however, finds the reasoning of the alternate line of cases cited herein, which includes two New York Court of Appeals decisions, more persuasive and chooses to follow that line of decisions instead.  But even assuming a reliance requirement exists, the FAC clears this hurdle.  A reasonable inference from the FAC is that Plaintiff was exposed to this term in the Agreement, as Plaintiff is a user of a TD Bank Credit Card, which uses a "form" contract, and complained about the cash-advance charge on Plaintiff's purchase via a peer-to-peer application as violative of this term in the Agreement.  (FAC, Dkt. 19, ¶¶ 12, 67); *see Kane v. Univ. of Rochester*, No. 23-CV-6027 (FPG), 2024 WL 1178340, at *17 (W.D.N.Y. Mar. 19, 2024) (maintaining that, even where a plaintiff does not expressly allege she saw the misleading statements, "where a plaintiff describes in detail the allegedly misleading and deceptive statements, 'the reasonable inference to be drawn' is that she 'saw the misleading statements'" (quoting *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp 3d 357, 361 (E.D.N.Y. 2014))); *Wurtzburger v. Ky. Fried Chicken*, No. 16-CV-8186 (NSR), 2017 WL 6416296, at *4 (S.D.N.Y. Dec. 13, 2017) (reaching a similar conclusion); *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446–47 (E.D.N.Y. 2015) (same).

21

Rather, to allege causation under Section 349, a plaintiff merely needs to show that she paid "more than [he] would have but for the deceptive practices of the defendant[]." *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (compiling cases); *Braynina v. TJX Companies, Inc.*, No. 15-CV-5897 (KPF), 2016 WL 5374134, at *10 (S.D.N.Y. Sep. 26, 2016) (same); *see Small*, 94 N.Y.2d at 56 (finding that plaintiffs did not allege causation and injury for deceptive advertising of cigarettes, despite claims that "had [plaintiffs] known that nicotine was addictive, they never would have purchased cigarettes" because "plaintiffs do not allege that the cost of cigarettes was affected by the alleged misrepresentation"). "Injury is adequately alleged under [Section 349] by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations." *Ackerman v. Coca-Cola Co.*, No. 09-CV-0395 (JG) (RML), 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010). In the context of representations made in credit card agreements, then, a plaintiff must allege that the bank's "disclosure of the [hidden] fees was inadequate, thus deceiving the cardholder into using his . . . card for [a] purchase[] when other more economical options were available." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004), *modified on recon.*, No. 03-CV-2843 (WHP), 2005 WL 1705285 (S.D.N.Y. July 22, 2005); *Lussoro*, 456 F. Supp. 3d at 491–92 (determining a plaintiff sufficiently alleged injury and causation because she contended that she incurred $56 in overdraft fees as a result of the defendants' deceptive contract language); *Richard*, 2021 WL 810218, at *17 (determining a plaintiff's Section 349 claim survived dismissal where she alleged "that Defendant's misleading contractual language caused her to incur Overdraft and NSF Fees that, but for Defendant's deceptive conduct, she would not have been charged"). The FAC alleges precisely that. Plaintiff contends that "[h]ad Plaintiff known [Defendant] would consider Plaintiff's payment via Wise to be a cash advance, Plaintiff would have chosen to make the payment for his

22

jewelry a different way." (FAC, Dkt. 19, ¶ 50.) Plaintiff additionally seeks "[r]estitution of all Cash Advance Fees paid to [Defendant] by Plaintiff," including the $59.11 fee from the Wise transaction. (*Id.* ¶ 48; *id.*, at 22.) Plaintiff plausibly alleges causation and injury.

Although Plaintiff's alleged injury is coextensive with the injury he sustained from Defendant's breach of contract, the Court disagrees with Defendant that this fact is dispositive of dismissal. (*See* MTD, Dkt. 24, at 22.) "[C]ourts in this Circuit have allowed § 349 claims to proceed alongside breach of contract claims even where the harm alleged for the § 349 claims is identical to the loss alleged for the breach of contract claims." *See Richard*, 2021 WL 810218, at *17 (compiling cases); *Roy*, 2020 WL 5849297, at *11 (rejecting argument that loss under Section 349 must be independent of the loss caused by the alleged breach of contract); *Lamoureux*, 592 F. Supp. 3d at 41 (same); *see also Nick's Garage*, 875 F.3d at 125 (rejecting the argument that Section 349 claims failed on summary judgment because plaintiff did "not allege an injury independent of their contract damages"). That is because the injury arising from a Section 349 claim is "more akin to damages related to overpaying for an item as a result of a defendant's deceptive conduct" than from a breach of contract. *Lussoro*, 456 F. Supp. 3d. at 492. Indeed, courts have declined to dismiss as duplicative complaints that allege, as here, that a plaintiff incurred fees which, but for a defendant's "misleading contract language," they would not have incurred. *See id.* at 492; *Richard*, 2021 WL 810218, at *17; *Smith v. Jovia Fin. Credit Union*, No. 20-CV-4237 (FB) (ST), 2021 WL 4173655, at *7 (E.D.N.Y. Aug. 24, 2021) (reaching a similar conclusion), *report and recommendation adopted*, No. 20-CV-4237 (FB) (ST), 2021 WL 4173069 (E.D.N.Y. Sep. 14, 2021). The Court therefore concludes that Plaintiff has plausibly alleged a Section 349 claim.

**B.    New Jersey Consumer Fraud Act**

The New Jersey Consumer Fraud Act ("NJCFA") provides a cause of action for individuals who suffer loss as a result of unlawful commercial practices, N.J.S.A. 56:8-19, such as "deception,

fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment," *id.* 56:8-2. To assert a claim under the NJCFA, a plaintiff must allege "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss.'" *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (quoting *Lee v. Carter-Reed Co.*, 203 N.J. 496, 521 (2010)).  Where the alleged unlawful act is "predicated on a valid contract, a plaintiff must further allege a 'substantial aggravating circumstance,'" *Burns v. TD Bank, N.A.*, No. 21-CV-18194 (KMW) (AMD), 2022 WL 17547258, at *9 (D.N.J. Dec. 8, 2022) (quoting *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997)); *see Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994).

Unlike New York's Section 349, NJCFA claims must be pled with particularity, pursuant to Federal Rule of Civil Procedure 9(b).  *Compare Migliore v. Vision Solar LLC*, 160 F.4th 79, 90 (3d Cir. 2025) ("Consumer Fraud Act claims are subject to Federal Rule of Civil Procedure 9(b)."), *with Costoso*, 74 F. Supp. 3d at 575 ("Claims brought under Section 349 are not subject to the heightened pleading requirements set forth in Rule 9(b)." (citation omitted)).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "[T]he adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific."  *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)).  Generally, to allege fraud with particularity, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or

24

omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). "[S]o long as the allegations are sufficiently particularized to put the defendant on notice as to what the plaintiff charges its fraudulent conduct consisted of, the date, time and place need not be pled with absolute precision." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 366 (E.D.N.Y. 2010); *see Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 477 (E.D.N.Y. 2001) (explaining, in the context of pleading securities fraud, that "a plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based" (citation omitted)).

Plaintiff has not sufficiently alleged a NJCJFA violation with particularity. While the FAC identifies the statements at issue, where the statements were made, and who made the statements, it fails to specify *when* those statements were made. Plaintiff charges that Defendant made misrepresentations concerning cash advance fees during "the course of its business," (Opp'n, Dkt. 26, at 24; FAC, Dkt. 19, ¶ 112), but does not provide a more specific timeline. Nor does the attached Agreement, as it is undated. (Agreement, Dkt. 19-1.) Courts have found allegations suggesting that misrepresentations occurred over a series of months to fall short of Rule 9(b)'s requisite particularity. *See Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 313 (S.D.N.Y. 2022) (compiling cases); *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995) (concluding that a "vague reference to a period of several months does not sufficiently apprise Defendant of when the allegedly fraudulent speech was made"); *Aronov v. Mersini*, No. 14-CV-7998 (PKC), 2015 WL 1780164, at *4 (S.D.N.Y. Apr. 20, 2015)

25

(concluding that allegations of an "approximate eight-month period during which the statements were made," lacked particularity); *Alnwick v. Eur. Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 640 (E.D.N.Y. 2003) (compiling cases finding a four-month window to not satisfy Rule 9(b)). Plaintiff's allegations here, which are even less definite, fail to give Defendant the requisite notice. *See Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 374 (D.N.J. 2015) (finding that complaint did not satisfy particularity requirements where complaint did not allege that "Plaintiffs actually saw this particular sign, in which store that occurred, or when Plaintiffs saw it"); *Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436, 440 (2d Cir. 2020) (summary order) (holding that "[p]laintiffs' allegation that Harris made an alleged misstatement, at an unidentified location, on an unidentified date in March 2013 and 'periodically thereafter'" failed to satisfy heightened pleading requirement). Accordingly, the Court grants Defendant's motion to dismiss as to Plaintiff's NJCFA claim.

### C.      Delaware Consumer Fraud Act

Plaintiff has informed the Court that he "declines to pursue his Delaware consumer protection claim." (Opp'n, Dkt. 26, at 2 n.1.) The Court thus dismisses Plaintiff's claims under the Delaware Consumer Fraud Act.

**CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss is granted in part and denied in part.  Specifically, the Court grants Defendant's motion as to Plaintiff's claims for (1) breach of the implied covenant of good faith and fair dealing, (2) violations of the NJCFA, and (3) violations of Delaware's Consumer Fraud Statute.  However, the Court denies Defendant's motion as to Plaintiff's breach of contract and Section 349 claims.  Those claims will proceed to discovery.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 10, 2026
        Brooklyn, New York

27